Marion Gordon ROBERTSON, Plaintiff,

v.

Paul N. McCLOSKEY, Jr., Defendant.

Marion Gordon ROBERTSON, Plaintiff,

v.

Andrew JACOBS, Jr., Defendant.

Civ. A. Nos. 86–2877, 86–2878.

United States District Court, District of Columbia.

July 24, 1987.

Julius Kaplan, Kaplan, Russin & Becchi, Washington, D.C., for plaintiff.

George A. Lehner, Sloan, Lehner & Ruiz, Washington, D.C., for McCloskey.

John C. Culver, Rodney F. Page and Barbara S. Wahl, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for Jacobs.

## OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff filed these suits alleging that defendants, former Representative Paul N. (Pete) McCloskey, Jr. and Representative Andrew Jacobs, Jr., libeled and conspired to defame him by publishing and disseminating certain statements concerning his military service during the Korean War.

Defendants now move to dismiss and for summary judgment on a variety of grounds. Plaintiff opposes that motion, and in addition moves to strike portions of defendants' supporting memorandum. For the reasons set forth below, defendants' motion will be granted in part and denied in part, and plaintiff's motion will be denied.

### I. *Factual Background*

In late 1950, Second Lieutenants Robertson and McCloskey were both in the Marine Corps stationed at Quantico, Virginia. Early in 1951, during the Korean War's heaviest fighting, the two men sailed together to the Far East aboard the U.S.S. *Breckinridge* as part of the Marines' Fifth Replacement Draft. The *Breckinridge* called at two ports in Japan before sailing to Korea, and at the second of these, Kobe, plaintiff and several of the other 45 Second Lieutenants were removed from the ship and transferred to the First Provisional Casual Company at Camp Otsu, Japan, a rehabilitation and training center for wounded men awaiting reassignment. The remaining officers and enlisted men joined various divisions of the First Marine Division in Korea. Of the 39 Second Lieutenants who sailed to Korea from Kobe, 38 joined front-line combat units; a number of these men were wounded or killed. McCloskey was among the officers who saw combat; he was wounded twice and awarded the Navy Cross and two Silver Stars for his service. Although McCloskey did not see Robertson again for the remainder of the war, he did meet other colleagues from the Fifth Replacement Draft who shared news about friends and acquaintances from the *Breckinridge*.

In February 1981, McCloskey, who had entered the race for the Republican nomination for a Senate seat from California, saw Robertson, by then a well-known evangelist, on television criticizing Congress for being "soft on communism." Several days later, McCloskey made a comment at a press conference about public figures whose patriotism "came late in life to those whose consciences had been overcome by their earlier evasion of military service." He mentioned, among others, Robertson, who he claimed had used the political influence of his father, Senator A. Willis Robertson, to avoid combat duty in Korea and secure a safe assignment as a division liquor officer. His comments were reported

in a *Los Angeles Times* article and were eventually brought to the attention of Robertson, who wrote McCloskey several weeks later claiming that his charges were "totally untrue, and equally libelous." McCloskey responded in a letter detailing his recollection of the events and conversations leading up to Robertson's departure from the *Breckinridge* in Kobe, and explaining that he had heard that Robertson, upon his arrival in Korea, had been assigned as liquor officer for a rear division. Robertson wrote McCloskey a second time, thanking him for his "kind letter" and stating that he "would like to clarify several things in it." He described McCloskey's political influence story as "certainly intriguing," but again called it untrue.

Nothing more came of the exchange until 1986, when defendant Jacobs, himself a former Marine and Korean War veteran, wrote McCloskey asking about the Robertson story. By this time, Robertson had publicly begun to explore the possibility of running for the presidency. Jacobs meanwhile had, on a number of occasions, raised questions concerning the military experience of national defense advocates and supporters of federal aid to the Nicaraguan contras. Jacobs' contention, which he had made both in debate in Congress and in statements to the press, was that many of the strongest advocates of military spending and military intervention in matters of foreign affairs were themselves people who had little or no firsthand experience of war, particularly combat.

McCloskey answered Jacobs' inquiry in the August 4, 1986 letter that gives rise to these suits. In this letter McCloskey wrote that:

> [Robertson] spoke frankly of his desire to avoid combat and to have his father, Senator Willis Robertson of Virginia, intervene on his behalf. When we went ashore at Yokesuka [sic], I believe most of us thought he was joking when he told us he was going to call his father and request transfer off the ship. He did make the call, however, and either didn't get through or wasn't successful in getting any action before the ship left for Kobe.

> . . . .

> My single *distinct* memory is of Pat, with a big grin on his face, standing at the dock at Kobe after his second phone call, saying something like, "So long, you guys—good luck," and telling us that his father had gotten him out of combat duty. Again, I don't think anyone was offended; I remember being amazed at the time that a U.S. Senator had that kind of power.

Appendix to Defendants' Motion to Dismiss and for Summary Judgment ("Defs. App.") at 2 (Letter of Paul McCloskey, Jr. to Rep. Andrew Jacobs, Jr. (Aug. 4, 1986)) (emphasis in original). McCloskey also stated in the letter that upon arrival in Korea, "Robertson had been made the division 'Liquor Officer'; . . . [whose] major duty was apparently to fly to Japan once a week and bring back booze for the officers' mess, but I would assume he had other [Headquarters] assignments as well." *Id.* at 4. Finally, McCloskey mentioned the *Los Angeles Times* article, stating that "Pat saw the article and sent me a letter mildly objecting, but making no objections as to its veracity." *Id.* at 5.

Jacobs released the letter to nationally syndicated columnists Evans & Novak and Jack Anderson in September 1986 and widely publicized stories followed. Following a further exchange of correspondence in September and October 1986, Robertson filed these suits, alleging that defendants had each libeled him and had jointly conspired to defame him.

## II.

### A. *Defendant Jacobs' Absolute Immunity Claim*

As an initial matter, the court turns to Jacobs' claim that he enjoys absolute immunity from common law tort liability for his official actions, and McCloskey's related contention that his letter responding to an official inquiry from Jacobs was privileged. Eschewing any reliance on the absolute immunity afforded by the Speech or Debate Clause, Jacobs argues that under the judicially created doctrine of offi-

cial immunity set forth in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), he is absolutely immune from common law tort liability for any acts taken "within the outer perimeter of [his] line of duty." *Id.* at 575, 79 S.Ct. at 1341. Dissemination of McCloskey's letter, he contends, falls comfortably within his legislative duty to inform the public on matters of national concern; the matter of concern in this case, he suggests, is the war record of public figures who advocate an increased national defense build-up. While the court does not in any way question the legitimacy of this subject of public debate, it does not find that Jacobs is entitled to the immunity he claims.

As this circuit has explained, the official immunity doctrine of *Barr* does not supplement the protections legislators enjoy under the Speech or Debate Clause, but rather provides an equivalent defense for officials of the judicial and executive branches. In *McSurely v. McClellan*, 753 F.2d 88 (D.C.Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985), the court stated that the immunity doctrine established by *Barr*

> applies to executive branch officials acting within the scope of their employment.... Protection similar to that afforded executive officials by *Barr* is supplied to members of Congress and their staffs through the Speech or Debate Clause of the Constitution. While *Barr v. Matteo* establishes absolute immunity for executive branch activity "within the outer perimeter" of an executive official's line of duty, the Speech or Debate Clause provides absolute immunity for conduct that is "part and parcel of the legislative process." *Gravel v. United States*, 408 U.S. 606, 626 [92 S.Ct. 2614, 2627, 33 L.Ed.2d 583] (1972).

*Id.* at 114. In arguing otherwise, Jacobs has apparently confused the concept of absolute immunity with that of qualified immunity—a doctrine that does not bar suit outright but permits officials to escape liability by showing that their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As this circuit explained in *Walker v. Jones*, 733 F.2d 923 (D.C.Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984), a case upon which defendant relies, "the Supreme Court has instructed that absolute immunity for members of Congress *does not extend beyond the scope of the Speech or Debate Clause*. ... members of Congress may assert the same qualified immunity available to executive officials...." *Id.* at 932 (emphasis added; citations omitted); *see also McSurely*, 753 F.2d at 100 (recognizing qualified immunity for Senate aides charged with violating plaintiff's constitutional rights); *Doe v. McMillan*, 566 F.2d 713 (D.C.Cir.1977) (Superintendent of Public Documents and Public Printer entitled to qualified immunity, though not Speech or Debate Clause immunity, for printing congressional report), *cert. denied*, 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 59 (1978).[1]

The court's conclusion that Jacobs' absolute immunity from common law tort liability extends no farther than the protections of the Speech or Debate Clause is further buttressed by the fact that a rule allowing legislators to supplement these protections through recourse to the official immunity doctrine would essentially render meaningless the Supreme Court's carefully drawn limitations on the reach of the Speech or Debate Clause. Thus, for example, in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Court rejected the contention that a Senator could

---

**1.** Jacobs also relies on footnote 13 in *Doe v. McMillan*, 412 U.S. 306, 319 n. 13, 93 S.Ct. 2018, 2028 n. 13, 36 L.Ed.2d 912 (1973), in which the Court observed that "[b]oth before and after *Barr*, official immunity has been held applicable to officials of the Legislative Branch. *See Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Dombrowski v. Eastland*, [387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967)]." The "official immunity" the Court refers to, however, is that provided by the Speech or Debate Clause; both *Tenney* and *Dombrowski* deal exclusively with the "legislative immunity" grounded in the Speech or Debate Clause and make no mention of any additional official immunities.

not, consistent with the Speech or Debate Clause, be held liable for defamation based on his dissemination of newsletters and press releases, because such an activity was part of the "informing function" of Congress. While recognizing the importance of this legislative activity, the Court concluded that it was not part of the "deliberative process" and thus not entitled to Speech or Debate Clause protection. *Id.* at 130–133, 99 S.Ct. at 2685–2686. For this court to rule that the informing function nevertheless falls within "the outer perimeter" of a representative's duties, and is thus shielded under the official immunity doctrine, would render the *Hutchinson* decision a hollow academic exercise. The Supreme Court has made clear that "[legislators] and their aides [are] absolutely immune *only* when performing 'acts legislative in nature,' and not when taking other acts *even 'in their official capacity.'*" *Harlow v. Fitzgerald,* 457 U.S. at 811, 102 S.Ct. at 2734 (*quoting Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972)) (emphasis added). Under *Hutchinson,* dissemination of information such as that involved here is not protected by the Speech or Debate Clause, and this court may not immunize under a different label conduct the Supreme Court has deemed unprotected.

### B. *Defendant McCloskey's Claim of Privilege*

■ Defendant McCloskey argues that, regardless of any constitutional immunity Jacobs may enjoy, under the common law his August 4, 1986 letter was a privileged communication for which he cannot be held liable. The common law privilege for communications made to a legislative body is set out in the Restatement (Second) of Torts § 590A (1977), which provides that:

[a] witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

Of particular importance to this case is the Restatement's "admonition against overbroad grants of immunity to communica-

tions preliminary to a legislative proceeding." *Webster v. Sun Co., Inc.,* 731 F.2d 1, 6 (D.C.Cir.1984). Comment [e] to Section 588 of the Restatement notes that the privilege only applies to such communications

when the communication has some relation to a proceeding that is *actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding.* The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.

Restatement (Second) of Torts § 588 comment e (1977) (emphasis added).

Here, McCloskey can point to no legislative proceeding concerning what Representative Jacobs has labeled the "War Wimp" issue—*i.e.,* the lack of military experience of public figures who advocate defense build-ups and U.S. military intervention in certain foreign policy matters. The most that he can offer are several newspaper columns on the subject and an isolated speech Jacobs gave on the floor of the House some eighteen months prior to the August 1986 letter. McCloskey nevertheless argues that, under comment c of section 588, a response to a legislative inquiry falls automatically within the privilege regardless of whether any proceeding is ongoing or seriously contemplated. The court cannot agree. Comment c provides that where "the defamatory matter is published in response to a question put to the witness by either counsel or by the judge, that fact is sufficient to bring it within the protection of the privilege, notwithstanding the fact that it is subsequently judged to be inadmissible." *Id.* comment c. While this rule applies to legislative proceedings as well as judicial, *see id.* § 590A comment a, and thus covers responses elicited by legislators as well as judges, it is apparent from the comment itself that the questions referred to are those asked during actual proceedings or preliminary to seriously contemplated proceedings. Were the rule not so limited, any time a judge or lawyer asked anyone a question pertaining to some legal matter, the response elicited would

always be privileged, even if that judge or lawyer asked out of idle, though professional, curiosity. Obviously, the privilege of "witnesses" to judicial proceedings does not extend so far, and neither should the protection afforded witnesses in legislative proceedings. "Legislative immunity is meant to encourage legitimate legislative input; it is not meant to insulate all statements, no matter how irrelevant to legislative business, that are channeled to the legislature." *Webster*, 731 F.2d at 5. It disparages neither the importance of the common law privilege for legislative witnesses, nor the legitimacy or sincerity of Representative Jacobs' interest in the military backgrounds of national defense advocates to hold that a response to a legislator's express inquiry is not absolutely shielded from common law liability when the inquiry and response are unrelated to any actual or seriously contemplated legislative proceedings.[2]

### III.

#### A. *Defamatory Meaning*

■ Defendants next claim that McCloskey's statements are not defamatory as a matter of law. This contention merits little discussion. The essence of the alleged libels are (1) that plaintiff spoke frankly of his desire to avoid combat and to have his father, a United States Senator, intervene on his behalf; (2) that following his removal from the U.S.S. *Breckinridge*, plaintiff became "division liquor officer" and "had the booze run to Japan"; and (3) that plaintiff only "mildly objected" to these allegations when he learned of them. In order to be defamatory, a statement must have some tendency "to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.Cir.1966) (en banc). The statements at issue here clearly meet that test.

While defendants advance a series of innocuous interpretations for these statements, they clearly are not the only, or even the most likely, meanings a reader would draw from the August 1986 letter. Thus, for example, defendants note that a desire to avoid combat is a perfectly understandable and human reaction, and that Robertson's use of whatever influence he had to escape actual combat is neither disgraceful nor odious, but again understandable. While perhaps some might read McCloskey's statement in such a charitable light, a great many others would find it highly offensive that a Senator's son simply called home and used his father's political influence to escape combat duty at a time when many other Second Lieutenants and other members of the service were being wounded or killed. Such conduct may be understandable, but it is far from commendable. McCloskey's statement, although stopping short of calling plaintiff an abject coward, certainly has the tendency to lower the community's estimation of Robertson.

Similarly, while defendants seek to portray the "division liquor officer" as a popular soldier who confers a much-welcome benefit on his peers, this designation read in context casts plaintiff as the military equivalent of a featherbedder, the beneficiary of political favoritism holding a safe, cushy job at a time when others risked, and some lost, their lives. Likewise, McCloskey's characterization of Robertson's response to these allegations as "mildly objecting," is more than euphemis tic given that Robertson called McCloskey's statements "totally untrue, and equally libelous," and it unmistakably conveys the impression that Robertson himself acknowledged the accuracy of the statements. Again, these statements at a minimum have a tendency to injure plaintiff's reputation and are thus actionable.

---

**2.** The absence of such proceedings distinguishes this case from *Webster v. Sun Co.,* 731 F.2d 1 (D.C.Cir.1984). In *Webster,* a congressional investigation was already underway and the central issue on appeal was whether unsolicited testimony fell within the common law privilege. Nothing in *Webster,* however, suggests that statements solicited by legislators are always privileged, regardless of the absence or pendency of legislative proceedings.

## B. *Falsity*

Defendants next argue that they are entitled to summary judgment because plaintiff cannot possibly establish the falsity of the alleged libels by clear and convincing evidence, an evidentiary standard compelled, they contend, by the Supreme Court's decision in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). In *Hepps,* the Court examined the constitutional dimensions of falsity in defamation law and held that the common law presumption that defamatory statements are false is inconsistent with the dictates of the first amendment when the speech at issue involves matters of public concern. *Id.* at 1564. Hepps himself was a private, not a public-figure, plaintiff; nevertheless the Court concluded that, for speech involving matters of public concern, the Constitution requires that plaintiffs rather than defendants bear the risk that the truth or falsity of a statement ultimately cannot be conclusively proved. *Id.* at 1563–64. Defendants argue that by constitutionalizing falsity along with actual malice, the Supreme Court implicitly imposed the same clear and convincing evidentiary standard for falsity that governs the element of actual malice. Especially where, as here, the plaintiff is a public figure,[3] they contend this higher standard is appropriate. *See Sharon v. Time, Inc.,* 599 F.Supp. 538, 558 (S.D.N.Y. 1984).

■ Regrettably, *Hepps* itself does not address or even mention the evidentiary standard that plaintiffs should bear when required to show falsity. Clear and convincing evidence of actual malice was deemed constitutionally compelled in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in order to remove the self-censorship that results under a common law rule that "compel[s] the critic of official conduct to guarantee the truth of all his factual assertions...." *Id.* at 279. The Court went on to explain that

> Under such a rule, would-be critics of official conduct may be deterred from

voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.

*Id.* Requiring proof of actual malice—that is, that the defendant published the challenged statement with knowledge of its falsity or in reckless disregard of its falsity—by clear and convincing evidence removes the chill of self-censorship by assuring that doubts concerning conduct arguably at the margins of bad faith will be resolved in favor of publishers.

So too here, a clear and convincing standard of proof for falsity would resolve doubts in favor of speech when the truth of a statement is difficult to ascertain conclusively. Indeed, as a practical matter, public-figure plaintiffs already bear such a burden, for in order to prove actual malice they must, of necessity, show by clear and convincing evidence that the defendant knew the statement was false or acted in reckless disregard of its truth. Finally, defendants' argument has more than merely a logical or symmetrical appeal. To instruct a jury that a plaintiff must prove falsity by a preponderance of evidence, but must also prove actual malice, which to a large extent subsumes the issue of falsity, by a different and more demanding standard is to invite confusion and error.

■ Viewing the facts under this more stringent standard then, and drawing all inferences in favor of plaintiff, as is required when passing on a motion for summary judgment, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), the court concludes that it cannot wrest this case from the jury. Taking the last of the alleged libels first, a reasonable jury could find by clear and convincing evidence that McCloskey's statement concerning plaintiff's 1981 letter was false. McCloskey stated that plaintiff's 1981 response to the charge of political intervention made "no objections to its veracity." Yet, in his February 17, 1981 letter, Robertson called McCloskey's

---

**3.** The parties agree that plaintiff is a public figure for purposes of this suit.

statements a "libelous personal attack," and denied that he had used political influence to avoid combat, labeling the claim "totally untrue, and equally libelous." *See* Appendix to Plaintiff's Opposition (hereinafter "P.A.") at 170. The tenor of the entire letter is far from vitriolic, and the court cannot say that McCloskey's characterization is, as a matter of law, false. Nonetheless, plaintiff is certainly entitled to place the question before a jury.

■ Unlike statements concerning plaintiff's 1981 letter, however, the other central allegations in this case do not lend themselves so readily to proof. The evidence offered by both sides concerning the truth or falsity of the "booze officer" and "political intervention" charges is fragmentary, sometimes contradictory, and often vague. Nor is this surprising, as the events at issue occurred over 35 years ago and the evidence relating to them consists primarily of recollections of largely unremarkable conversations that took place on board a transport ship or during brief periods of leave in Japan. In such circumstances, credibility is crucial, and credibility—which in this case includes not only truthfulness but also the ability to remember distant events—is a determination that must be made by a jury, regardless of the substantive evidentiary standard governing the merits of the cases. *Anderson*, 106 S.Ct. at 2513.

With respect to the "political intervention" charge, plaintiff has offered his own denial that he ever telephoned or wired his father from either Yokosuka or Kobe, Japan, to seek his intervention and avoid combat duty. Edwin Gaines, plaintiff's closest friend in the Marine Corps at the time, stated at his deposition that he accompanied plaintiff while they were on leave in Yokosuka and that he had no recollection of plaintiff making any telephone calls or any other effort to communicate with his father. Gaines testified that at no time did plaintiff ever mention enlisting his father's aid to avoid combat. P.A. at 74A–76, and Major General Jack M. Frisbie, who shared quarters with Gaines on the transport ship, stated that Robertson visited their stateroom frequently and that during those visits he never heard either Gaines or Robertson discuss any plans to be removed from the Fifth Replacement Draft. *Id.* at 184–85. Retired General Lemuel C. Shepherd, who served as Commanding General of the Pacific Fleet Marine Force from 1950 to 1952, stated in a letter to plaintiff and in written responses to interrogatories, that Robertson's reassignment from the Fifth Replacement Draft to Camp Otsu, Japan, was not unusual, and was not the result of a directive from the Marine Commandant, the Secretary of the Navy, or Senator Robertson. *Id.* at 142, 213–15. Harold Sawyer, General Shepherd's personal aide and secretary from 1946 to 1956, testified that he handled all of the General's correspondence and has no recollection of any request made by plaintiff's father or any promise of a favor extended by General Shepherd to Senator Robertson. *Id.* at 201–09. Finally, Colonel Robert Burns stated that he frequently met in-coming transport ships in Japan and pulled officers for temporary assignment at Camp Otsu, and that "from time to time" he was given the names of specific officers to remove. *Id.* at 131.

The court does not wish to suggest, through this one-sided recitation of plaintiff's evidence, that plaintiff has the better of the argument on this issue, or that defendants' contradictory evidence and testimony is somehow less deserving of credence. Rather, the court's sole purpose is to demonstrate that plaintiff has offered sufficient evidence to raise a material question of fact as to the falsity of defendant's statement such that summary disposition is inappropriate. Particularly where the weight of so much evidence in the case turns on credibility, and where many of the central issues can only be proved, if at all, by inference, the ultimate decision must be made by a jury, not this court.

Similarly, while plaintiff has not shown conclusively that he never made liquor runs in conjunction with his trips between Korea and Japan, he has offered, in addition to his own denial of that statement, evidence of his official title and duties while in Korea; the deposition testimony of Foster LaHue,

the division adjutant for the First Marine Division Headquarters in Korea in 1951 and 1952, who stated that there was no division liquor officer position and that none of his assistants ever had such an assignment, *id.* at 70; and statements from John Gearhart and Christopher Lindsey, the two men McCloskey identified as the sources of his information concerning plaintiff's "booze run" assignments, in which both men deny knowledge of any such activity by plaintiff. *Id.* at 65–68. While this evidence may not entitle plaintiff to summary judgment, it does entitle him to an opportunity to put evidence before a jury. Defendants' motion for summary judgment on the question of falsity, therefore, must be denied.

### C. *Actual Malice*

Defendants also contend that plaintiff cannot, as a matter of law, establish by clear and convincing evidence that they acted with malice, and thus they are entitled to summary judgment on this basis. The court finds that while plaintiff has raised material questions of fact concerning defendant McCloskey's state of mind, plaintiff's evidence is insufficient to preclude judgment in favor of defendant Jacobs.

As noted above, under *New York Times Co.*, a public figure such as Robertson must ultimately establish by clear and convincing evidence that defendants published the challenged statements with knowledge of their falsity or in reckless disregard of their truth or falsity. The test governing actual malice, of course, is a subjective one. "It does not turn on whether a reasonably prudent person would have published under the circumstances." *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C.Cir.1987). Rather, the plaintiff must offer clear and convincing evidence sufficient " 'to permit the conclusion that the defendant[s] in fact entertained serious doubt as to the truth of [their] publication.' " *Id.* at 788 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (brackets in original)). In addition to direct evidence, however, "plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence...." *Id.* at 789. Plaintiff has offered just such a grab-bag of circumstantial evidence here. This evidence, while not overwhelming, would permit a reasonable juror to find that McCloskey acted with the requisite state of mind for purposes of public figure defamation. This same evidence, however, falls far short of demonstrating with convincing clarity that Jacobs entertained "serious doubts as to the truth" of McCloskey's charges.

To begin with, plaintiff notes that at the time McCloskey wrote Jacobs that plaintiff had only "mildly objected" to, and essentially acquiesced in the accuracy of, his allegations, McCloskey had in his possession two letters from plaintiff labeling the charges untrue and libelous. Similarly, when McCloskey wrote that plaintiff's major duty in Korea was to serve as his division's liquor officer, he had already received a letter from John Gearhart, the man he initially identified as the source of this information, in which Gearhart denied having any such knowledge. Plaintiff acknowledges that failure to investigate does not, by itself, establish bad faith. *St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326. Here, however, plaintiff put McCloskey on notice that he considered the statements libelous, yet defendant pressed on, not only ignoring these denials but mischaracterizing them as well. Indeed, with respect to his statements that plaintiff served as a "booze officer" in Korea and that plaintiff acquiesced in his version of plaintiff's war record, McCloskey's sin of omission was not simply a failure to investigate, but a failure to consider contradictory evidence already in his possession. Moreover, McCloskey has presented nothing to indicate that he was under any deadline pressures or that he was caught up in any heated political debate which would excuse his failure to take any actions in response to plaintiff's denials and Gearhart's letter.

In addition, McCloskey essentially conceded at his deposition that his characterization of Robertson's 1981 letters was misleading:

Q. Does [Robertson] also contest the fact that you have implied that he agreed with your story by never challenging it?

A. Yes. And he's correct in that respect. In 1981 he differed with what I had said, and he is certainly entitled to a retraction, and I'm glad to say as he has said that he denies these things.

P.A. at 54. Despite this concession, and his promise to issue a retraction, McCloskey has never repudiated this alleged libel other than as stated above.

Plaintiff also points out that while the August 1986 letter is unequivocal in its account of the "political intervention" charge, McCloskey himself was far less certain of events at his deposition. Thus, in the letter itself he stated:

When we went ashore at Yokesuka [sic], I believe most of us thought he was joking when he told us he was going to call his father and request transfer off the ship. He did make the call, however, and either didn't get through or wasn't successful in getting any action before the ship left for Kobe.

. . . .

My single *distinct* memory is of Pat, with a big grin on his face, standing on the dock at Kobe after his second phone call, saying something like, "So long you guys—good luck," and telling us that his father had gotten him out of combat duty.

Defs. App. at 2 (emphasis in original). At his deposition, however, McCloskey admitted that he could not remember whether plaintiff ever actually told him or anyone else that his father had gotten him off the ship, and that he did not know whether plaintiff's father had in fact intervened on his son's behalf. P.A. at 38–39, 56–57. In addition, McCloskey acknowledged he did not see plaintiff make any calls home, and that plaintiff never actually told him that he had made any such calls. McCloskey remembered only that plaintiff had said he was going to try to call his father, and he admitted that it was his *impression* that plaintiff had tried and failed at Yokosuka. *Id.* at 48–52. McCloskey insists, of course, that regardless of whether his memory of

events 35 years ago is correct in all particulars, he honestly believed, and continues to believe, that the essential features of his account are true—*i.e.*, that plaintiff intended, attempted, and eventually managed to secure his father's intervention to avoid combat duty. In addition, the court recognizes that " 'immaterial variances and defects of proof upon minor matters are to be disregarded if the substance of the charge is justified.' " *Tavoulareas,* 817 F.2d at 788 (quoting *Skrocki v. Stahl,* 14 Cal.App. 1, 6, 110 P. 957 (1910)). Nevertheless, the marked contrast between McCloskey's unqualified assertions in the August 1986 letter and his equivocation at his deposition could reasonably be viewed as circumstantial evidence that he in fact entertained doubts as to the truth of his statements.

■ Malice, of course, does not require a showing of actual ill-will; indeed, because of its potentially prejudicial impact on juries, evidence of ill-will is generally inadmissible in the absence of other indicia of malice. *Tavoulareas,* 817 F.2d at 795 & n. 45. Because plaintiff has offered such other evidence here, however, the court concludes he is entitled to place his statements before a jury pertaining to McCloskey's motivation. Plaintiff offers an October 6, 1986 letter to a John DeWitt, in which McCloskey wrote:

Dear Death March:

I thought you might enjoy the follow-up Los Angeles Times column on Robertson. The more this thing gets circulated, the more 2nd Lieutenants come forward to nail Robertson to his own cross.

P.A. at 61. Whether or not the letter can be fairly characterized, as plaintiff contends, as "brutal, vicious and inhumane," Plaintiff's Opposition at 9, or is merely jocular, it is again circumstantial evidence from which a jury could infer bad faith on McCloskey's part. In addition, consistent with the letter's reference to circulation of the political intervention charges, McCloskey himself discussed these charges in the media several times after his August 1986 letter was released to the press. Under the circumstances, and in conjunction with the other evidence of malice noted above,

this willingness to publicize statements challenged as libelous could be viewed as evidence of reckless behavior.

█ Again, the court emphasizes that for purposes of deciding this motion, any and all inferences must be drawn in favor of the non-moving party, the plaintiff. While plaintiff's evidence does not demonstrate, as a matter of law, that McCloskey acted with actual malice, it is sufficient to place the issue in the hands of a jury. For this court to rule otherwise would amount to trial by deposition excerpt, a course expressly disavowed in *Anderson*, 106 S.Ct. at 2513.

█ The foregoing discussion also reveals, however, that virtually all of plaintiff's evidence of malice concerns McCloskey rather than defendant Jacobs. While McCloskey had received two letters of protest from plaintiff before publishing, Jacobs had in his hands a letter from McCloskey assuring him that Robertson had been apprised of his charges and had essentially acknowledged their accuracy. While Jacobs might have, out of an abundance of caution, requested copies of Robertson's response, his failure to do so can hardly be characterized as evidence of a reckless disregard for the truth, particularly as McCloskey was a friend and former congressional colleague whose word he had no reason to doubt. *Cf. St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326 (malice may be shown where statement is "based wholly on an unverified anonymous telephone call" or "where there are obvious reasons to doubt the veracity of the informant"). Jacobs, of course, was equally unaware of the Gearhart letter, nor did he have any reason to suspect that McCloskey's memory of events was more indistinct than he revealed in his letter.

Plaintiff nevertheless insists that McCloskey's story was so inherently improbable that both Jacobs and McCloskey should have recognized its probable falsity. This argument borders on the specious.

Stripped of its indignant tone, plaintiff's argument amounts to mere quibbling over the likelihood that anyone could have arranged a transfer similar to the one he is alleged to have made on such short notice. Significantly, he does not claim that the use of political influence to spare a relative the ugliness of combat is itself improbable, nor could he. The wide circulation of McCloskey's charges in the media is itself testimony to the public's willingness to accept as probable such political favoritism in the military. More importantly, Senator Robertson's own correspondence reveals that he exerted such influence on behalf of friends, Defs. App. at 152–59; in fact in one such letter he expressed his gratitude that the requested transfer was accomplished "without ... anything in the nature of political influence [appearing] in [the beneficiary's] files," *id.* at 160; confirmation, if any were needed, that the practice was not uncommon. Instead of denying the practice, however, plaintiff focuses on the difficulties of communicating between Japan and the United States in 1951; the significant difference in time zones between the two countries; the unlikelihood that he would have actually reached his father, who was known to have a busy travel schedule; and the short space of time in which his father allegedly arranged for his transfer. All these factors, he insists, render McCloskey's story "utterly preposterous." Plaintiff's Opposition at 77. The court cannot agree. Whatever logistical problems might have encumbered such a transfer in 1951, they do not amount to *clear and convincing* evidence from which a jury could reasonably find that Jacobs knew or should have known that his friend's story was preposterous and false. This evidence may support an inference that McCloskey's political intervention charge is false, but such an inference falls far short of demonstrating with convincing clarity that Representative Jacobs actually entertained serious doubts as to the essential truth of the charge.[4]

---

4. Plaintiff also suggests that the mere passage of time somehow should have alerted Jacobs that McCloskey's story was false. This argument is without merit. The fact that memories may fade over the course of 35 years does not render objective facts any more or less probable. McCloskey's inability to recall exact conversations or where they took place has no discerni-

Plaintiff also offers as evidence of actual malice the fact that he and Jacobs differ politically. Such an argument displays a profound insensitivity to the first amendment values that animate libel law in the area of public speech. In light of the Supreme Court's now famous dictum that "debate on public issues should be uninhibited, robust, and wide-open," *New York Times*, 376 U.S. at 270, 84 S.Ct. at 721, it is hard to imagine a more inappropriate proffer of evidence of actual malice than the fact that the speaker and the subject of his speech disagree politically, particularly where, as here, the speaker is an elected representative and the subject of his speech is a presidential hopeful. As the Supreme Court has stated elsewhere, "it can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). The contention that Jacobs' dissemination of McCloskey's letter to groups that strongly oppose plaintiff's political views or his desire to use the letter for his own political gain are evidence from which a jury could reasonably infer actual malice, would eviscerate the first amendment safeguards that underlie the clear and convincing evidentiary standard in public speech cases. This argument is directly contrary to the philosophy embodied in the first amendment that "speech 'honestly believed,' *whatever the speaker's motivation,* 'contribute[s] to the free interchange of ideas and the ascertainment of truth.'" *Tavoulareas*, 817 F.2d at 795 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964) (emphasis added)).

In sum, plaintiff has failed to produce sufficient evidence from which a jury could reasonably find, by clear and convincing evidence, that Jacobs published McCloskey's story with actual knowledge of its falsity or in reckless disregard of its falsity. Since plaintiff cannot establish this essential element of his claim against Jacobs, the latter is entitled to summary judgment.[5]

Finally, McCloskey argues that as a matter of law plaintiff has no claim for either compensable or punitive damages and that these claims must therefore be dismissed. In response, plaintiff has proffered an expert witness whose proposed testimony will purportedly link lower-than-expected sales of plaintiff's autobiography to publication of the alleged libels, as well as one or two handwritten notes from followers of plaintiff who withdrew their financial support as a result of this suit. In light of the wholly inadequate record, the court will deny the motion on the issue until immediately prior to the close of plaintiff's case-in-chief, at which time defendant may renew his claim if then appropriate.

### IV. *Plaintiff's Motion to Strike*

 In addition to opposing defendants' motion, plaintiff moves to strike certain portions of that motion which, he contends, contain falsehoods and intentional or reckless inaccuracies. An order striking these inaccuracies is necessary, he argues, in order to prevent this court from ruling on the basis of erroneous information and to counteract the prejudical pretrial publicity that resulted from defendants' dissemination of their motion to the press. Plaintiff's motion is not well taken for a number of reasons. First, plaintiff had an adequate remedy for both of the injuries allegedly caused by defendants' motion—namely, the

---

ble bearing on whether a claim that a United States Senator intervened in order to spare his son from combat is believable or preposterous.

5. This conclusion that Jacobs is entitled to summary judgment on plaintiff's libel claim necessarily entitles both Jacobs and McCloskey to summary judgment on plaintiff's claim that the two men conspired to defame him, since a conspiracy requires at least two actors. Even were this not the case, summary judgment is required as to this count of the complaint because plaintiff's evidence, even when viewed in the most favorable light, shows nothing more than a collaborated or a joint purpose to publish, which is legally insufficient to support a conspiracy to defame claim. *See Dowd v. Calabrese*, 589 F.Supp. 1206, 1213–14 (D.D.C.1984) (plaintiff must produce specific evidence of a joint purpose to defame, rather than proof of separate and distinct improper purposes by each).

right to file an opposition to that motion. Indeed, oppositions serve just such a purpose, allowing non-moving parties to call into question or challenge a movant's recitation or characterization of the relevant facts and law. In addition, insofar as plaintiff is upset over adverse press reports, his motion to strike is essentially moot, since an order striking portions of defendants' filing will not alter the fact that press reports have already been published. Finally, plaintiff's motion again displays a deep distrust of the public's ability to separate allegations from facts. The answer to allegedly false speech is not less speech, but more. Plaintiff has had every opportunity to apprise this court and the public of any omissions, inaccuracies, or misrepresentations in defendants' papers. This is sufficient. The motion to strike, therefore, will be denied.

### V. Conclusion

Accordingly, for all the foregoing reasons, it is

ORDERED that defendants' motion to dismiss or for summary judgment be and it hereby is denied in part and granted in part. Defendant Andrew Jacobs, Jr.'s motion for summary judgment is granted as to all claims against him. Defendant Paul N. McCloskey, Jr.'s motion for summary judgment is denied as to that portion of the complaint charging him with libel and defamation, and is granted as to that portion of the complaint charging him with conspiracy to defame plaintiff; and it is

FURTHER ORDERED that Civil Action No. 86–2878 be and it hereby is dismissed with prejudice; and it is

FURTHER ORDERED that plaintiff's motion to strike portions of defendants' memorandum in support of their motion to dismiss and for summary judgment is denied; and it is

FURTHER ORDERED that counsel for the parties shall attend a settlement conference in chambers on September 23, 1987 at 9:15 a.m., to which they shall bring their maximum settlement authority. Should

the case fail to settle at that time, pretrial and trial dates shall then be scheduled.